

**SO ORDERED,**

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: April 27, 2021**

**The Order of the Court is set forth below. The docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

| | |
|---|---|
| **EARNIE MARTIN AND SANDRA MARTIN,** | **CASE NO. 19-03585-NPO** |
| **DEBTORS.** | **CHAPTER 7** |
| **DONALD DEMORY** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 20-00008-NPO** |
| **EARNIE MARTIN** | **DEFENDANT** |

## MEMORANDUM OPINION AND ORDER ON
## AMENDED COMPLAINT TO DETERMINE THE
## <u>DISCHARGEABILITY OF A DEBT PURSUANT TO 11 U.S.C. § 523</u>

This matter came before the Court for virtual trial on March 15-16, 2021 (the "Trial"), on

the Amended Complaint to Determine the Dischargeability of a Debt Pursuant to 11 U.S.C. § 523

(the "Complaint") (Adv. Dkt. 7)[1] filed by Donald Demory ("Demory") and the Answer &

Response to Amended Complaint to Determine Dischargeability of a Debt Pursuant to 11 U.S.C.

§ 523 (the "Answer") (Adv. Dkt. 14) filed by the debtor, Earnie Martin a/k/a Earnest L. Martin Jr.

---

[1] Citations to the record are as follows: (1) citations to docket entries in the above-styled adversary proceeding (the "Adversary") are cited as "(Adv. Dkt. __)"; and (2) citations to docket entries in the above-styled bankruptcy case are cited as "(Bankr. Dkt. __)".

("Martin"), in the Adversary.  The Court entered the Pretrial Order (the "PTO") (Adv. Dkt. 35) on December 22, 2020.  The Trial originally was set to begin on January 7, 2021 but was cancelled because of COVID-19-related concerns.  The parties thereafter engaged in virtual mediation. (Adv. Dkt. 39, 40).  The mediation was unsuccessful, and the Trial was rescheduled.

At the Trial, Adam Stone and Stacey M. Buchanan represented Demory, and Richard F. Dean and Gregory J. Faries represented Martin.  Demory submitted Plaintiff's Proposed Findings of Fact and Conclusions of Law (Adv. Dkt. 50) on the morning of the first day of the Trial, and Martin submitted Defendant's Proposed Findings of Fact and Conclusions of Law (Adv. Dkt. 52) late at the end of the second day of the Trial.  During the Trial, Demory introduced into evidence sixteen (16) exhibits.[2]  In his case in chief, Demory testified on his own behalf and called Martin as an adverse witness.  Martin testified on his own behalf in his case in chief and also presented the testimony of his father, Earnest L. Martin, Sr. ("Earnest Sr."); his nephew, Jessie Martin ("Jessie"); his wife, Sandra E. Martin ("Sandra" or together with Martin, the "Martins"); and Mark Atkinson ("Atkinson").[3]  Demory testified on his own behalf in rebuttal.  The Court ruled from the bench at Trial that the debt Martin owed Demory is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).  This Opinion memorializes and supplements the Court's bench ruling.[4]

---

[2] Demory's exhibits are cited as "(Ex. __)".  Martin listed five (5) exhibits in the PTO but failed to file them on the docket before the Trial began.  *See* Notice Regarding Hearings in Jackson Division (Judge Neil P. Olack) (July 1, 2020), mssb.uscourts.gov/special-notices/court-hearings/. Martin's exhibits, therefore, were excluded.  *See* FED. R. BANKR. P. 7016(f).

[3] The nature of the business relationship between Atkinson and Martin is unclear.  *See infra* pp. 7-11.

[4] The Court makes the following findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**Jurisdiction**

This Court has jurisdiction over the parties to and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (I), and (O).  Notice of the Trial was proper under the circumstances.

**Facts**

Demory is an eighty-two (82) year-old retired executive of a utility company in Fairfax County, Virginia who resides with his wife in Culpeper, Virginia.  (Adv. Dkt. 58 at 16-17).  Demory has had a lifelong interest in vintage cars and, in particular, 1957 Chevrolet Bel Air convertibles and 1959 Chevrolet two (2)-door Impalas.

Demory first met Martin in December 2008.  Demory and his wife were driving home from a family vacation when Demory spotted a 1957 Chevrolet Bel Air convertible parked in front of Earnest Sr.'s house in Edwards, Mississippi.  (Adv. Dkt. 58 at 17).  The house sits on the frontage road near a major interstate highway.  Demory stopped and spoke with Martin who gave him a tour of the automotive body shop (the "Shop") located behind the house.  Martin's father, Earnest Sr., owns the Shop where he operates "EL Martin Restoration." (Adv. Dkt. 58 at 104, 149).  Although Martin performs restoration work on antique cars at the Shop, he does not hold any ownership interest in EL Martin Restoration.  Martin testified that he had attempted to start his own automotive body shop but the business had failed.[5]  Demory and Earnest Sr. exchanged introductions, but Demory talked mostly with Martin.  (Adv. Dkt. 58 at 19).

Martin gave Demory his business card.  (Ex. 1; Adv. Dkt. 58 at 18).  The card reads in large type "Classic & Antiques" and off to the side, "Complete Restoration Service." (Ex. 1).  The

---

[5] In their joint tax returns, Martin and Sandra reported income in 2015 and 2017 from "E&S Shop," described as a business engaged in "automotive, mechanical and body work"  and "automotive body."  (Exs. 13 at 4, 15 at 7).

name "E.L. Martin" appears at the bottom of the card along with the address of the Shop.  Martin wrote his telephone number above a blank line near the center of the card.  (Ex. 1; Adv. Dkt. 58 at 95).

Demory told Martin that he owned a 1957 red Chevrolet Bel Air Hardtop (the "Red Bel Air Hardtop") and a red 1959 Chevrolet four (4)-door Impala (the "Red 4-Door Impala") and anticipated someday having both vehicles restored.  (Adv. Dkt. 58 at 18-19).  He also told him he wanted the Red Bel Air Hardtop changed from a hardtop to a convertible.  Martin offered to restore the Red Bel Air Hardtop for $50,000.00 and the Red 4-Door Impala for $28,000.00.  Demory accepted his offer with a handshake.  (Adv. Dkt. 58 at 19).  Their agreement was never reduced to a writing.  Demory assumed a timeline of approximately six (6) months to complete the restoration of the Red Bel Air Convertible, but there was no discussion about how long the restorations would take to complete.  (Adv. Dkt. 58 at 55).

On May 19, 2009, Martin and Earnest Sr. traveled to Florida to the home of Demory's daughter, Marie Cunningham ("Marie"), where Demory and his wife were staying, to take possession of the Red Bel-Air Hardtop.  While there, Martin proposed to trade the Red Bel Air Hardtop for another vehicle of the same make and model at the Shop (the "Red Bel Air Convertible").  (Adv. Dkt. 58 at 20).  Martin told Demory that work already had begun on the Red Bel Air Convertible, and Demory readily agreed to the exchange.  At this juncture, the Red Bel Air Hardtop now belonged to Martin and the Red Bel Air Convertible to Demory.[6]  Martin and Earnest Sr. loaded the Red Bel Air Hardtop onto a trailer but did not take possession of the Red 4-

---

[6] Demory did not obtain the title documents to the Red Bel Air Convertible until nearly seven (7) years later.  (Adv. Dkt. 58 at 21).

Door Impala during this trip because the trailer was only large enough to hold one vehicle. (Adv. Dkt. 58 at 22).

Demory handed Martin the title to the Red Bel Air Hardtop and a $25,500.00 check. (Ex. 2 at 3; Adv. Dkt. 58 at 23). The check was a deposit for payment of the restoration of the Red Bel Air Convertible ($25,000.00) and reimbursement for the cost of transporting the two vehicles ($500.00) to Mississippi. (Ex. 2 at 3). Earnest Sr. endorsed the $25,500.00 check and deposited it into his bank account. (Adv. Dkt. 58 at 151). Martin did not hold a personal bank account. (Adv. Dkt. 58 at 186). Several weeks later, Martin returned to Marie's house in Florida to transport the Red 4-Door Impala and assorted parts to the Shop.

In July 2009, Martin informed Demory that a black 1959 two-door Chevrolet Impala (the "Black 2-Door Impala") was available for sale. (Adv. Dkt. 58 at 23). Demory agreed to buy it and sent Martin a $9,000.00 check dated July 7, 2009.[7] (Ex. 2 at 4). Earnest Sr. endorsed the $9,000.00 check and deposited it into his account. (Adv. Dkt. 58 at 151). Demory then entered into another oral agreement with Martin to restore the Black 2-Door Impala, which Martin would begin after completing the restorations of the Red Bel Air Convertible and the Red 4-Door Impala. (Adv. Dkt. 58 at 24). Payment would be on a time-and-material basis rather than for a fixed price.

In August 2009, Martin informed Demory that he was ready to install the motor in the Red Bel Air Convertible. On August 27, 2009, Demory and his son-in-law, Troy Cunningham ("Troy"), delivered the motor for the Red Bel-Air Convertible to the Shop. (Adv. Dkt. 58 at 27).

During the next six (6) years, a pattern of conduct emerged between Demory and Martin where Demory would mail a check to Martin, made payable to "E.L. Martin," whenever Martin

---

[7] As with the Red Bel Air Convertible, Demory did not obtain the title documents to the Black 2-Door Impala until nearly seven (7) years later. (Adv. Dkt. 58 at 21).

requested additional funds for parts and labor associated with the restorations.  (Adv. Dkt. 58 at 5, 25-27).  In all, Demory and his wife wrote sixteen (16) checks totaling $76,400.00 from August 27, 2009 to November 11, 2015 for the restoration work on the Red Bel Air Convertible and the Red 4-Door Impala.  (Ex. 2).  Some of these checks were endorsed by Earnest Sr. and deposited into his bank account and others were endorsed by Martin and either cashed by Martin or deposited by Sandra into her bank account at Regions Bank.  Martin and Earnest Sr. share nearly identical names.  Martin never provided receipts for the purchase of any parts and never mailed Demory any photographs of the vehicles to show the progress of the restorations despite Demory's requests that he do so.  (Adv. Dkt. 58 at 26).

From August 27, 2009 to May 4, 2010, Demory mailed Martin four (4) checks for the restorations of the Red Bel-Air Convertible and/or the Red 4-Door Impala, as follows:

| Date | Amount | Memo |
|---|---|---|
| August 27, 2009 | $10,000.00 | 1957 Chev Restore |
| November 4, 2009 | $14,000.00 | Restore 57 & 59 Ch |
| January 22, 2010 | $5,000.00 | Restore 1957 & 1959 Chev |
| May 4, 2010 | $6,000.00 | Restore 57 & 59 Chev |

(Ex. 2 at 5-8).  Martin cashed the August 27, 2009 and November 4, 2009 checks.  (Ex. 2 at 5-6; Adv. Dkt. 58 at 102).  Earnest Sr. endorsed and deposited the other checks into his bank account.

In July 2010, Demory arrived at the Shop in a turquoise 1957 Chevrolet Bel-Air (the "Turquoise Bel Air Hardtop"), which he had paid a restorer in Florida approximately $70,000.00 to restore.  Martin pointed out some mistakes in the restoration work, and Demory paid him $7,000.00 to replace the seats and correct the alignment.  (Adv. Dkt. 58 at 25).  All work on the Red Bel Air Convertible stopped while Martin completed the work on the Turquoise Bel Air

Hardtop. (Adv. Dkt. 59 at 51). Demory does not make any claims related to the work performed by Martin on the Turquoise Bel Air Hardtop in the Adversary.[8] The Turquoise Bel Air Hardtop, nevertheless, is relevant to the parties' dispute because of Martin's allegation that the original agreement as to the scope and extent of the restoration work on the other vehicles changed after July 2020.

Martin viewed the Turquoise Bel Air Hardtop as a "show" car. (Adv. Dkt. 58 at 85, 137). According to Martin, restoring a "show" car requires more labor than a "daily driver" car. Demory denied that he ever changed the agreement as to the quality of the restoration work. He did not discern a difference between restoring a "daily driver" car as opposed to a "show" car and was unfamiliar with those terms. He wanted the vehicles restored to "show car" quality but also intended to drive them. (Adv. Dkt. 58 at 46-47). Sometime after July 2020, Martin asked Atkinson to assist him in restoring the Red Bel Air Convertible to meet the purportedly higher standards of a "show" car, which required them to undo and correct the work previously performed. (Adv. Dkt. 59 at 7-11, 64). Atkinson testified that he worked with Martin for approximately six (6) consecutive weeks. (Adv. Dkt. 59 at 6). In exchange for Atkinson's labor, Martin traded him a car. (Adv. Dkt. 58 at 98-99).

During the next two years, Demory occasionally called Martin to inquire about visiting the Shop to check on the progress of the restoration work. (Adv. Dkt. 58 at 70-71). Martin gave excuses why Demory should delay the trip. For example, one weekend in October 2010, Demory called Martin to tell him he was on his way to the Shop from Virginia. (Adv. Dkt. 58 at 70-71).

---

[8] Because Demory did not make any claims for the Turquoise Bel Air Hardtop in the Adversary, the money Demory paid Martin for work on that vehicle is not included in the Court's analysis.

About twenty (20) miles into Alabama, however, the trip was interrupted when Martin called to tell them that he was in Texas and no one was at the Shop to allow him inside the gate.

Before his next visit to the Shop in June 2012, Demory sent two checks and a MoneyGram to Martin, as follows:

| Date | Amount | Memo |
|---|---|---|
| May 3, 2011 | $5,000.00 | Restore 57 & 59 Chev |
| February 9, 2012 | $3,000.00 | (MoneyGram) |
| March 14, 2012 | $5,000.00 | 57 & 59 Chev |

(Ex. 2 at 1-2, 9-10).  Martin endorsed the check dated March 14, 2012, and Sandra deposited it into her bank account at Regions Bank.  (Adv. Dkt. 58 at 95, 100).  Martin testified that he deposited the checks into Sandra's bank account to hide the money from Earnest Sr. who he alleged had a gambling problem.  (Adv. Dkt. 58 at 101-02).  He used Sandra's bank account for this purpose because he did not hold a personal bank account.  (Adv. Dkt. 58 at 186).  When asked at Trial about Martin's allegation that he had a gambling problem, Earnest Sr. testified, "He's a liar." (Adv. Dkt. 58 at 159).

On June 28, 2012, Demory and his wife visited the Shop to inspect the progress of the restorations.  (Adv. Dkt. 58 at 26-27).  They discovered that no progress had been made on the vehicles since Demory and Troy had delivered the motor for the Red Bel Air Convertible to the Shop in August 2009.  (Adv. Dkt. 58 at 27).  When asked about the lack of progress, Martin offered several excuses, including that his granddaughter had been ill.  (Adv. Dkt. 58 at 27).  Martin nevertheless assured Demory that he intended to complete the restorations and requested $5,000.00 to pay for additional parts.  Demory's wife then wrote a $5,000.00 check made payable to "E.L. Martin."  (Ex. 2).  The memo line of the check refers to the restoration of the Red Bel Air

Convertible and the Red 4-Door Impala.[9]  (Ex. 2 at 12).  Over the next three-and-a-half years,

Demory mailed Martin nine (9) checks, made payable to "E.L. Martin," as follows:

| Date | Amount | Memo |
|------|--------|------|
| July 2, 2012 | $3,000.00 | 1959-348 Motor |
| July 3, 2012 | $1,800.00 | Transmission |
| August 13, 2012 | $4,000.00 | Restore 57 & 59 Chev |
| December 13, 2012 | $5,000.00 | Restore 57 Chev & 59 Chev |
| July 6, 2013 | $3,500.00 | 57 Chev & 59 Chev |
| December 10, 2013 | $5,100.00 | Restore 57 & 59 Chev |
| November 1, 2015[10] | $1,000.00 | 1957 & 1959 Restore Conv |
| November 2, 2015 | $2,000.00 | 1957 & 1959 Chev Restor |
| November 11, 2015 | $1,000.00 | 1957 & 1959 Restore |

(Ex. 2 at 12-20; Adv. Dkt. 58 at 96-97, 100).  Martin endorsed all of the above checks, and Sandra

deposited them in her bank account at Regions Bank.  (Ex. 2 at 11-20).

As of November 11, 2015, Demory had paid "E.L. Martin" $104,400.00 to restore the Red

Bel Air Convertible and the Red 4-Door Impala (Ex. 2 at 1-20), and he began to lose patience with

the lack of progress.[11]  Demory expressed his frustration to Martin, and Martin became concerned

that he "could get locked up for something because that's a lot of money involved."  (Adv. Dkt.

---

[9] Although this check is dated June 20, 2012, Demory testified that the visit occurred on June 28, 2012.  (Adv. Dkt. 58 at 71).

[10] This check was written by Demory's wife.  (Ex. 2 at 18).

[11] Earnest Sr. testified that for $100,000.00, the restoration of all three vintage cars should have been seventy to eighty percent (70-80%) complete.  (Adv. Dkt. 58 at 161-62).

59 at 70).   Then, in an about-face, Martin told Demory on March 2, 2016, that all three (3) vehicles—the Red Bel Air Convertible, the Red 4-Door Impala, and the Black 2-Door Impala—had been fully restored and were ready to be shipped to him in Virginia.  Martin admitted at Trial that this statement was a lie.  (Adv. Dkt. 58 at 73-75).

When the agreed-upon delivery date had passed and the vehicles had not arrived in Virginia, Martin told Demory a series of evolving lies to hide the truth, which was that the vehicles had never actually left the Shop and the restoration work was nowhere near completion.  (Adv. Dkt. 59 at 69).  Martin told Demory that:  (1) the delivery truck had broken down; (2) the driver could not locate a replacement part for the truck; (3) the driver decided to rent another truck; and (3) the driver had made a detour to Illinois to make another delivery.  (Adv. Dkt. 58 at 29).  After numerous telephone calls, Demory received a firm delivery date and time of April 27, 2016 at noon.   At 2:00 p.m. that day, however, the vehicles still had not arrived.  Martin then lied to Demory that the driver had stolen the cars.  (Adv. Dkt. 58 at 29).  When Demory asked him the driver's name, Martin lied again.  He told Demory that the "receipt" for the shipment had fallen in the mud and the driver's name and telephone number had become illegible.  (Adv. Dkt. 58 at 29).

A few days later, Marie contacted the local Sheriff's Office in Hinds County, Mississippi to inquire about the status of the allegedly stolen vehicles.  (Adv. Dkt. 58 at 29).  A sheriff's deputy drove to the Shop to investigate and in a telephone call to Demory informed him that he had located two (2) of the allegedly stolen vehicles there—one inside the Shop under a plastic cover and the other outside the Shop under a tarp.  (Adv. Dkt. 58 at 29).  The deputy could not locate the third vehicle.  Shortly thereafter, Martin called Demory begging him not to send him to jail.  (Adv. Dkt. 58 at 29).

On May 2, 2016, Marie and Troy traveled to the Shop to meet with Martin. (Adv. Dkt. 58 at 30). Once there, they spoke with Martin and Atkinson, who again was helping Martin restore the Red Bel Air Convertible and who told them he was in the process of forming a business partnership with Martin. Marie and Troy were able to locate all three (3) vehicles at the Shop. Two of the vehicles were where the sheriff's deputy said they were. The third vehicle was located outside the Shop under a pile of tires. (Ex. 10).

During this visit, Martin, Atkinson, and Marie, acting as Demory's agent,[12] executed a four-page handwritten Contract (the "First Contract"). (Ex. 3; Adv. Dkt. 58 at 30). The First Contract explained that it was "executed due to the delay in restoration of three (3) vehicles owned by Mr. Donald Demory . . . which are in and have been in the possession of Earnest Martin, Jr. and Mark Atkinson." (Ex. 3 at 1). The First Contract set a deadline of "[t]wo weeks from the date of this Contract, May 16, 2016," for Martin and Atkinson to reach certain milestones in the restoration of the Red Bel Air Convertible. The "condition of the body" of the Red Bel Air Convertible was "to be ready for the sound mat to be installed as well as the gauges, wiring, upholstery, etc." (Ex. 3). By this same deadline, they were to move the other two (2) vehicles in an "easily accessible location on the property with all parts to those vehicles to insure two complete vehicles can be made." (Ex. 3 at 1-2). The First Contract also provided that "[o]n or about May 16, 2016," Demory or his agent would inspect the work to determine "whether the work [on the Red Bel Air Convertible] will be continued by Earnest Martin, Jr., and Mark Atkinson, or the three (3) vehicles will be promptly removed from the property." (Ex. 3 at 2). If the work was not completed by the deadline, "[t]he entire sum paid in advance for this work from Mr. Donald Demory to Mr. Earnest Martin, Jr. and Mark Atkinson, shall immediately be paid in full with

---

[12] The parties do not dispute that Marie acted as Demory's agent.

interest allowable by law from the date of the payment(s) by Mr. Demory." (Ex. 3 at 3). At that point, Demory and his wife had paid $104,400.00 for the restoration work. (Ex. 2).

The First Contract was signed by Martin, Atkinson, and Marie, as Demory's agent, and was witnessed by two (2) other individuals. (Ex. 3 at 4). At the bottom of the First Contract, Atkinson wrote, "In addition to said contract I Mark Atkinson am not liable for any prepayments on said vehicles made before May 22nd 2016." (Ex. 3 at 3; Dkt. 59 at 22). Martin testified that he did not understand the First Contract, and that he was able to read only "a little bit." (Adv. Dkt. 58 at 118, 148).

On May 16, 2016, Demory, Wesley (Demory's son), Marie, Troy, and two (2) of Troy's relatives traveled to the Shop to inspect the Red Bel Air Convertible and recover the other two vehicles. (Adv. Dkt. 58 at 33). If their inspection revealed that the restoration work outlined in the First Contract had not been completed, they intended to recover the Red Bel Air Convertible too. They called the Sheriff's Office of Hinds County, Mississippi to arrange for a deputy to meet them there.

It is undisputed that Martin and Atkinson had not completed the work outlined in the First Contract. (Adv. Dkt. 58 at 125). Also, they had not moved the Red 2-Door Impala or the Black 2-Door Impala. Indeed, the Red 4-Door Impala was still under a pile of tires, and the Black 2-Door Impala remained under a tarp. (Adv. Dkt. 58 at 33).

Demory and Martin signed three (3) documents, the Contract (the "Second Contract") (Ex. 5 at 1-3), the Bill of Sale (Ex. 4), and the Promissory Note (the "Note") (Ex. 5 at 4-5). The Second Contract explained that it was being executed "due to the absence of the titles that were to be supplied with (2) two vehicles purchased by Mr. Donald Demory from Mr. Earnest Martin, Jr." The Second Contract required Martin to mail the titles to the Red Bel Air Convertible and the

Black 2-Door Impala[13] to Marie within two (2) weeks,[14] and if the Black 2-Door Impala appraised for less than $9,000.00, Martin would pay the difference to Demory.  (Ex. 5).  The Bill of Sale memorialized the sale of the Black 2-Door Impala in July 2009.

Martin proposed to repay Demory $100,000.00, in three monthly payments of $30,000.00 beginning in June and the remaining payment of $10,000.00 in September. (Adv. Dkt. 58 at 35-36).  Martin assured Demory that he expected to sell a restored 1958 Pontiac for $50,000.00-$70,000.00 in the near future and would have the funds available to pay the installments due under the Note.  The Note reflects this agreement.  Specifically, Martin promised to pay Demory:  (1) $100,000.00 in three (3) monthly installments of $30,000.00 beginning June 15, 2016 and one final payment of $10,000.00 on September 15, 2016; and (2) his attorneys' fees and costs "for collection or suit."  Martin agreed to submit to the jurisdiction of Culpeper County, Virginia for any lawsuit.  (Ex. 5 at 4-5).  The Note provided that it was governed by Virginia law.  (Ex. 5 at 5).

Martin testified that he signed the Note because Wesley threatened him with bodily harm "if he didn't take care of his father" but could not recall the exact words used.  (Adv. Dkt. 58 at 127-28, 130).  Martin did not tell the Sheriff's deputy he had been threatened, and a photograph shows Martin casually standing next to Marie while signing a document.  (Ex. 12).

Demory and his crew loaded the Red 4-Door Impala, the Red Bel Air Convertible, and the Black 2-Door Impala onto trailers and hauled them away.  The vehicles were not in operable condition, and the Red 4-Door Impala and Black 2-Door Impala had not been assembled.

---

[13] Both vehicles actually had been owned by Earnest Sr.  (Adv. Dkt. 59 at 76-77).

[14] Demory already had provided Martin with the title to the Red Bel Air Hardtop that had been traded for the Red Bel Air Convertible.  (Adv. Dkt. 58 at 21).

Moreover, the spare parts that had been wrapped in newspaper and placed inside the Red 4-Door Impala were missing. (Ex. 16).

The 1958 Pontiac did not sell, and Martin did not make any payments to Demory under the Note. (Adv. Dkt. 58 at 133-34, 139). On April 6, 2017, Demory brought suit against Martin in the Circuit Court of Culpeper County, Virginia (the "Circuit Court") in Case No: CL17000392-00, for nonpayment of the Note. (Adv. Dkt. 58 at 139). Demory sought a judgment of $100,000.00 plus interest and attorney's fees.

Martin chose not to defend the lawsuit. (Adv. Dkt. 58 at 139). On June 29, 2017, the Circuit Court entered an Order finding that Martin properly was served with process, that he failed to respond timely to the complaint, and that he was in default. (Ex. 6). The Circuit Court granted Demory a judgment against Martin for $100,000.00, with interest at six percent (6%) per annum from June 16, 2016, attorney's fees of $25,000.00, and court costs of $239.00 (the "Default Judgment") (Ex. 6), for a total of $125,239.00 plus interest. On September 7, 2018, Demory filed and enrolled the Default Judgment with the Clerk of the Circuit Court of Hinds County, Mississippi, Second Judicial District. (Ex. 7).

On October 8, 2019, the Martins filed a petition for relief under chapter 7 of the U.S. Bankruptcy Code (the "Code"). (Bankr. Dkt. 1). On October 21, 2019, the Martins filed their bankruptcy schedules, listing Demory in Schedule D: Creditors Who Have Claims Secured by Property (Bankr. Dkt. 9 at 14) as the holder of a claim in the amount of $137,123.55 secured by a judgment lien. The Martins did not list the claim as either contingent, unliquidated, or disputed.

On February 27, 2020, Demory filed the Complaint. The Complaint contains two counts through which Demory seeks an exception to the discharge of the debt owed him in the amount of $137,123.55. Demory alleges that Martin made "material misrepresentations at the outset of his

business relationship with Mr. Demory that he knew were not true." (Adv. Dkt. 7 at 6). Demory further alleges that Martin "entered into the Note with Mr. Demory with no intention of repaying the money he had previously received from Mr. Demory and/or with the knowledge that he lacked the ability to make payments." (Adv. Dkt. 7 at 7). These allegations, according to Demory, render Martin's debt nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)[15] (Count I). Demory also contends that Martin "hurt" the value of the Red 4-Door Impala and the Black 2-Door Impala by storing them outside the Shop where they were exposed to the elements. Demory also asserts that Martin removed parts to the cars that he failed to replace. This conduct, according to Demory, amounts to "willful and malicious injury" and renders Martin's debt nondischargeable pursuant to § 523(a)(6) (Count II). Finally, Demory requests reimbursement of his attorneys' fees and costs incurred in the Adversary.

On March 17, 2020, Martin filed the Answer. In addition to certain defenses raised under Federal Rule of Civil Procedure 12(b),[16] Martin alleges in the Answer that: (1) the vehicles were entrusted to Earnest Sr., and, therefore, any contracts regarding the restoration work were between Demory and Earnest Sr., and any monies paid by Demory for the restoration work were used by and for the benefit of Earnest Sr.; (2) all monies obtained by Martin from Demory were used to restore the vehicles; (3) any contracts Martin entered into were not made in good faith by Demory,

---

[15] Hereinafter, all code sections refer to the Code, unless otherwise noted.

[16] Rule 7012 of the Federal Rules of Bankruptcy Procedure makes Rule 12(b) of the Federal Rules of Civil Procedure ("Rule 12(b)") applicable to adversary proceedings. Martin alleges in the Answer that this Court lacks personal jurisdiction (Rule 12(b)(1)), that process was insufficient (Rule 12(b)(4)), that service of process of the Complaint was insufficient (Rule 12(b)(5)), and that the Complaint fails to state a claim upon which relief can be granted (Rule 12(b)(6)). Martin did not raise any of these defenses in the PTO. The Court, therefore, finds that these defenses have been waived. *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998) (holding that a joint pretrial order supersedes all pleadings and governs the issues to be tried).

lacked consideration, and were executed under duress and threat of physical violence, or, in the alternative, the contracts were signed by Martin for the benefit of Earnest Sr.; (4) the Circuit Court lacked personal and subject matter jurisdiction, and, therefore the Default Judgment is void; and (5) Martin did not make any material representations to Demory.  (Adv. Dkt. 14 at 2-5).

### Discussion

Usually, "all debts arising prior to the filing of the bankruptcy petition will be discharged." *United States v. Coney*, 689 F.3d 365, 371 (5th Cir. 2012) (citing *In re Bruner*, 55 F.3d 195, 197 (5th Cir. 1995)).  Although this is the general rule, "Congress has provided that certain types of liabilities are excepted from the general rule of discharge" in order to "ensure that the Bankruptcy Code's 'fresh start' policy is only available to 'honest but unfortunate debtor[s].'"  *Id.*  (citations omitted).  "The statutory provisions [in § 523(a)] governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debt." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

In order to prevail, the party asserting the exception to discharge must prove that the debt is nondischargeable by a preponderance of the evidence.  *Id.* at 291; *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995) (citing *Grogan*, 498 U.S. at 286); FED. R. BANKR. P. 4005.  A fact is proven by a preponderance of the evidence if the Court finds it more likely than not that the fact is true. *EPA v. Sequo Corp. (In re Bell Petroleum Servs., Inc.)*, 3 F.3d 889, 909-10 (5th Cir. 1993).  Intertwined with this burden is the basic principle that "exceptions to discharge must be strictly construed against the creditor and liberally construed in favor of the debtor." *Country Credit, LLC v. Kornegay (In re Kornegay)*, Adv. Proc. 11-00042-KMS, 2012 WL 930818, at *3 (Bankr. S.D. Miss. Mar. 19, 2012) (citations omitted).

A.     **Amount of Debt**

A bankruptcy court cannot declare a debt nondischargeable until the creditor establishes the existence and amount of that debt. *Bancorp South Bank v. Avery (In re Avery)*, 594 B.R. 655 (Bankr. S.D. Miss. 2018). Thus, before discussing the nondischargeability of the underlying debt, the Court pauses here to address the existence and amount of the debt that Demory seeks to except from discharge. *See Husky Int'l Elec., Inc. v. Ritz (In re Ritz)*, 832 F.3d 560, 562 (5th Cir. 2016) (noting on remand from the U.S. Supreme Court that if "there is no debt to discharge[,] the question of the deniability of a discharge under § 523(a)(2) is moot").

In their bankruptcy schedules, the Martins listed the full amount of the Default Judgment debt as a claim held by Demory in the amount of $137,123.55 secured by a judgment lien. They did not indicate that the Default Judgment debt was contingent, unliquidated, or disputed. "Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions." *Rex-Tech Int'l, LLC v. Rollings (In re Rollings)*, 451 F. App'x 340, 348 (5th Cir. 2011) (citation & quotations omitted). Accordingly, because the Martins listed the Default Judgment debt in the bankruptcy schedules as uncontested, Martin may not challenge the validity of that underlying debt in the Adversary based on the doctrine of judicial admissions. *Huddleston v. Whelan (In re Whelan)*, 582 B.R. 157, 165 n.11 (Bankr. E.D. Tex. 2018).

Further, even if Martin had scheduled the Default Judgment debt as disputed, the *Rooker-Feldman* doctrine bars him from collaterally attacking its validity. *See Aguiluz v. Bayhi (In re Bayhi)*, 528 F.3d 393, 402 (5th Cir. 2008); *In re Nazu, Inc.*, 350 B.R. 304, 320-22 (Bankr. S.D. Tex. 2006) (debtor's request that a bankruptcy court review a default judgment denied under *Rooker-Feldman*). Under the *Rooker-Feldman* doctrine, "federal district courts, as courts of

original jurisdiction, lack appellate jurisdiction to review, modify, or nullify final orders of state courts." *Liedtke v. State Bar of Tex.*, 18 F.3d 315, 317 (5th Cir. 1994). *Rooker-Feldman* casts in jurisdictional terms the more familiar principle that federal courts must give "full faith and credit" to a state court judgment. *Gauthier v. Continental Diving Sers., Inc.*, 831 F.2d 559, 561 (5th Cir. 1987); 28 U.S.C. § 1738.

Martin offered testimony at Trial contesting the validity of the underlying debt. For example, he asserted at Trial and/or in the PTO that he is not liable because: (1) there was no meeting of the minds as to the essential terms of the First Contract; (2) the Note lacked consideration; (3) any contracts entered into with Demory involved Earnest Sr. or EL Martin Restoration; (4) he signed the Note under duress; and (5) the Default Judgment is void because the Circuit Court lacked personal and subject matter jurisdiction. (Adv. Dkt. 14 at 2-3). Martin should have raised these defenses to payment in the Virginia state court action. In making these assertions, Martin essentially is asking this Court to "review, modify, or nullify" a final order of the Circuit Court.

Although *Rooker-Feldman* doctrine bars Martin from obtaining relief from the Default Judgment, it does not require the Court to give greater deference to the Default Judgment than a Virginia court would give it. Instead, as explained by the Fifth Circuit Court of Appeals, *Rooker-Feldman* requires a federal court to "give the same deference to a state court judgment that a court of the rendering state would give it." *Gauthier*, 831 F.2d at 561. Martin's contention in the PTO that the Default Judgment is void because the Circuit Court lacked personal and subject matter jurisdiction requires the Court to examine whether a Virginia state court would permit Martin to attack the Default Judgment on these grounds. (Adv. Dkt. 35 at 8). In support of his jurisdictional

arguments, Martin asserts, without elaboration, that "Virginia had no connection to any of the parties or writings." (Adv. Dkt. 35 at 8).

In Virginia, a judgment entered by a court that does not have jurisdiction over the subject matter is void. *Church v. Church*, 483 S.E.2d 498, 500 (Va. Ct. App. 1997). Here, however, the Circuit Court clearly had subject matter jurisdiction over the parties' dispute arising from the nonpayment of the Note. By statute, circuit courts in Virginia have subject matter jurisdiction over contract disputes. VA. CODE ANN. § 17.1-513 (amended 2021).

As to personal jurisdiction, Martin testified at Trial that he was served with a copy of the complaint but that he did not file an answer or other response because he did not have sufficient funds to retain a lawyer to represent him. (Adv. Dkt. 58 at 139). No other evidence was presented regarding the state court proceedings.

Although Martin contends that "Virginia had no connection to any of the parties or writings," the Note contained a forum selection clause: "If there is a lawsuit, borrower agrees to submit to the jurisdiction of the county of Culpeper County, the State of Virginia." (Ex. 5 at 5). In Virginia, forum selection clauses are enforceable. *Paul Business Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.2d 804, 807 (Va. 1990). The Circuit Court clearly had personal jurisdiction over Martin. Because the Default Judgment is a valid state-court judgment entitled to "full faith and credit," 28 U.S.C. § 1738, the Court turns next to the preclusive effect of the Default Judgment under Virginia law.[17] *Conn. Bank of Comm. v. Congo*, 309 F.3d 240, 248 (5th Cir. 2002) (holding that in determining the preclusive effect of a prior state court judgment, federal courts must apply

---

[17] The Default Judgment does not prevent Demory from looking beyond the state court proceeding to show that the debt at issue is nondischargeable under § 523(a). *Brown v. Felsen*, 442 U.S. 127, 135 (1979).

the preclusion law of the state that rendered the judgment); *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1201 (5th Cir. 1996).

The seminal case in Virginia as to the preclusive effect of a default judgment is *TransDulles Center, Inc. v. Sharma*, 472 S.E.2d 274 (Va. 1996).  For collateral estoppel to apply, five elements must be met:

> (1) the parties to the two proceedings must be the same or in privity; (2) the prior proceeding must have resulted in a valid and final judgment against the party against whom preclusion is sought or his privity; (3) the factual issue to be precluded must have been actually litigated in the prior proceeding; (4) the factual issues to be precluded must have been essential to the judgment in the prior proceeding; and (5) there must be mutuality, that is, a party is generally prevented from invoking the preclusive force of a judgment unless that party would have been bound had the prior litigation of the issue reached the opposite result.

*Chun Song v. Duncan (In re Duncan)*, 448 F.3d 725, 728 (4th Cir. 2006) (citing *TransDulles*, 472 S.E.2d at 274).  Three of the elements of collateral estoppel are easily met.  The parties to the state proceeding are the same, and the state court proceeding resulted in a valid default judgment.  *Id.* Here, the preclusive effect of the Default Judgment turns upon the remaining two elements, whether the issue to be precluded was actually litigated and necessary to the state court proceeding. This analysis requires the Court to "look to the actions of the parties prior to entry of that default judgment" as well as the completeness of the record before it.  *Reed v. Owens (In re Owens)*, 449 B.R. 239 (Bankr. E.D. Va. 2011).  There is no evidence before the Court as to the state court proceedings prior to entry of the two-page Default Judgment except for Martin's testimony that he was served with process and did not answer the Complaint.  There is no proof that the issues in the state court proceedings were actually litigated.  Thus, other than the existence and amount of the debt owed Demory, no other facts arise from the state court proceeding as to the nature of the debt

that are binding upon the parties.[18]  Demory must establish the nondischargeability of the Default Judgment debt, if at all, based on the evidence presented at Trial.

**B.      Nondischargeability of Debt**

In the Complaint, Demory seeks a finding of nondischargeability of the debt owed by Martin under either § 523(a)(2)(A) or § 523(a)(6).  Because the Trial record supports the denial of the discharge of the Default Judgment debt pursuant to § 523(a)(2)(A), the Court finds it unnecessary to address Demory's alternative nondischargeability claim under § 523(a)(6).

**1.      § 523(a)(2)(A)**

Section 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).  The statute encompasses three independent grounds for non-dischargeability, all of which apply to "debts obtained by frauds involving moral turpitude or intentional wrong." *First Nat'l Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 813 (5th Cir. 1992).  In defining the elements of non-dischargeability under § 523(a)(2)(A), the Fifth Circuit has applied different, but overlapping, elements of false representations, false pretenses, and actual fraud.  *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 402-03 (5th Cir. 2001).

To establish a claim for false representations or false pretenses under § 523(a)(2)(A), a creditor must prove by a preponderance of the evidence that the debtor's representations or pretenses were: "(1) knowing and fraudulent falsehoods; (2) describing past or current facts; (3) that were relied upon by the other party." *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483

---

[18] The preclusive effect of the Default Judgment on Demory's claim for attorneys' fees and costs incurred in the Adversary is addressed in a separate order.

(5th Cir. 1992). There is a subtle distinction between a false representation and a false pretense. A false representation requires an express statement, whereas a false pretense may be based on misleading conduct alone. *Lanier v. Futch (In re Futch)*, No. 09-00144-NPO, 2011 WL 576071, at *16 (Bankr. S.D. Miss. Feb. 4, 2011). False pretenses may be defined as "any series of events, when considered collectively, that create a contrived and misleading understanding of the transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329, 384 (Bankr. N.D. Tex. 2017) (quotations & citations omitted).

It is not necessary that the false representation or false pretense be made in writing for the debt to be excepted from discharge. *Md. Central Collection Unit v. Johnson (In re Johnson)*, No. 19-00183, 2019 WL 4164860, at *5 (Bankr. D. Md. Aug. 30, 2019). A debtor's silence regarding a material fact may qualify as a false representation or pretense under § 523(a)(2)(A). *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 399 (5th Cir. 2017).

A debtor's promise related to a future action that does not purport to depict a current or past fact cannot be defined as a false representation or false pretense. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991). Even if the debtor's subsequent breach is unjustified, a promise related to a future action does not qualify. *See In re Futch*, 2011 WL 576071, at *16. A misrepresentation of the debtor's intention to perform contractual duties, however, may be a false representation if the debtor had no intention of performing any of the obligations under the contract. *In re Allison*, 960 F.2d at 484.

The false representation or pretense must have been relied upon by the creditor. Section 523(a)(2)(A) does not explicitly state a reliance standard. The U.S. Supreme Court in *Field v. Mans*, 516 U.S. 59, 60 (1995), held that § 523(a)(2)(A) requires justifiable, but not reasonable,

reliance. The recipient of a misrepresentation is justified in relying on the falsehood even if he might have ascertained the truth through further investigation. *In re Mercer*, 246 F.3d at 417. Reliance on a misrepresentation is justifiable "unless its falsity is obvious or there are 'red flags' indicating such reliance is unwarranted." *Id.* at 418.

Apart from false representation or false pretense, § 523(a)(2)(A) also encompasses actual fraud as a separate ground for nondischargeability. *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016). In *Ritz*, the U.S. Supreme Court declined to adopt a definition of fraud because of the multiplicity of situations in which fraud may arise. *Id*. at 1586-87. The U.S. Supreme Court noted, however, that fraud within the meaning of § 523(a)(2) "connotes deception or trickery." *Ritz*, 136 S. Ct. at 1586.

### a.    False Representations

Demory alleges that Martin made repeated false representations with the intent of deceiving him. These allegedly false representations included: (1) the need to purchase car parts for the Red Bel-Air Convertible when no record of such purchases exists; (2) that Martin was unavailable to meet with Demory at the Shop; (3) that the restorations were completed; and (4) that the vehicles had been shipped to Demory in Virginia. Demory contends that as "an older man living in a different state" from Martin, he justifiably relied on Martin's misrepresentations. (Adv. Dkt. 50 at 15).

Demory contends that by May 2, 2016, he had multiple potential civil claims against Martin, including fraud, breach of contract, and unjust enrichment. Rather than bringing suit at that time, Demory states that he entered into the First Contract, which extended the time for Martin's performance. Demory alleges that Martin had no present intention of performing the First Contract and, in fact, lacked the funds, equipment, and labor to do so. Demory states that

when Martin did not perform under the First Contract, he and Martin entered into the Note, which gave Martin four (4) months to repay Demory an amount that was less than the amount he owed for breaching the First Contract. Demory contends that Martin misrepresented his ability to fulfill both the First Contract and the Note and had no present intention of fulfilling either contract. Finally, Demory alleges that he justifiably relied on Martin's misrepresentations by entering into the Note, rather than immediately filing suit.

The Code protects creditors who are deceived into forbearing collection efforts. *In re Selenberg*, 856 F.3d at 397 (denying discharge where the debtor entered into a promissory note with his creditor, in exchange for a promise not to sue, and did not make the payments). Under § 523(a)(2)(A), an extension of credit, such as a promissory note, is an indulgence by a creditor, giving a debtor further time to pay an existing debt. *Id.* As mentioned above, a misrepresentation of a debtor's intention to perform contractual duties may be a false representation if the debtor had no intention of performing any of the obligations under the contract. *In re Allison*, 960 F.2d at 484.

The Court finds that the Note is an extension of credit, given in exchange for Demory's forbearance of collection on his claims against Martin, for Martin's failure to perform under the First Contract. After Demory discovered that his vehicles, in fact, had not been stolen, Martin asked Demory not to send him to jail and promised to complete the restoration work. Approximately one week later, on May 2, 2016, Marie and Troy visited the Shop to check on the vehicles. At this point, Martin, Atkinson, and Demory, through Marie, entered into the First Contract, with Martin and Atkinson agreeing to complete certain tasks on the Red Bel Air Convertible by May 16, 2016. Martin admits that he failed to perform his obligations under the First Contract. When those tasks were not completed by the May 16, 2016 deadline, Demory gave

Martin another extension.  On May 16, 2016, Demory and Martin entered into the Note, in which Martin agreed to repay Demory the amount he owed for failure to perform the First Contract into four (4) separate payments.  (Ex. 5).  The Note also reduced the total amount that Martin owed from approximately $104,400.00 under the First Contract to $100,000.00.  (Exs. 4, 5).  At the time the Note was executed, however, Martin had no intention to perform his obligations under the Note.  He signed the Note to induce Demory to forego bringing any lawsuit against him.

Demory justifiably relied on Martin's representations to him that he had the financial ability to pay the Note because of a pending sale of the 1958 Pontiac at the Shop.  Ultimately, Martin did not make any payments under the Note.  The standard for reliance for purposes of § 523(a)(2)(A) is not whether an objectively reasonable person would have relied on Martin's representations.  The inquiry instead is whether Demory's reliance was justifiable from a subjective standpoint.  In that regard, the Court notes that Demory lacked any experience in the restoration business.  The Court, therefore, finds that the Default Judgment debt is nondischargeable under the false representations prong of § 523(a)(2)(A).

### b.    False Pretenses & Actual Fraud

The Court finds that the Martin's misrepresentations and conduct also fall into the categories of "false pretenses" and "actual fraud" under § 523(a)(2)(A).  In an analogous case, a homeowner, "73 years old," entered into a contract with the debtor to repair her home which had sustained substantial damage after Hurricane Katrina. *Zimmerman v. Seuzeneau (In re Seuzeneau)*, No. 10-1133, 2011 WL 6258306, at *2 (Bankr. E.D. La. Dec. 15, 2011).  The cost of the repairs was $100,000.00, which included the construction of a garage.  The debtor represented to the homeowner that the repairs to her home were near completion and asked her to remit the final payment.  She paid the final payment due under the contract.  After full payment was made, the

homeowner discovered that the repairs were not completed, the home was still uninhabitable, and the garage had not been constructed. The bankruptcy court found that the debtor knowingly misrepresented to the homeowner that the contract was substantially completed, that the debtor intended to deceive the homeowner in order to induce her to continue making payments under the contract, and that the homeowner's reliance was justifiable "because of her advanced age." *Id*. Accordingly, the bankruptcy court found that the debtor made a false representation and deemed his debt nondischargeable under § 523(a)(2)(A). *Seuzeneau*, 2011 WL 6258306, at *2.

Similarly, Martin continued to collect payments from Demory under the guise that the restorations of the vehicles were progressing. When Demory attempted to visit the Shop to check on the progress of the work, Martin gave him various excuses as to why he could not visit the Shop at that time. When Demory did visit the Shop again on June 28, 2012, no progress had been made on the vehicles since his last visit nearly three (3) years earlier on August 27, 2009.

Martin admits that he lied during the course of his business dealings with Demory in the years 2012, 2013, and 2014. While Demory continued to make payments whenever Martin requested them, little to no progress was being made on the restorations. Martin kept no records of expenses for labor, parts, or materials in regard to any restoration work that purportedly was performed on the vehicles. Except for the top frame, Martin used the trove of parts acquired by Earnest Sr. at the Shop.

Earnest Sr.'s testimony provides some clues as to why the restoration work stopped while Demory continued making payments. Earnest Sr. testified that Demory stopped sending payments and "when the money stops, that old man quits." (Adv. Dkt. 58 at 153). Earnest Sr., however, was unaware that Martin had been cashing the checks mailed by Demory. (Adv. Dkt. 58 at 153). The checks were made payable to "E.L. Martin," a name that could refer to either Martin or Earnest

Sr. The explanation Martin offered—that Earnest Sr. was gambling away the company's money—was unsupported by any evidence other than Martin's own testimony. Earnest Sr. emphatically denied that he had a gambling problem. Sandra and Atkinson testified that Martin never told them that Earnest Sr. was gambling away company funds. (Adv. Dkt. 58 at 189; Adv. Dkt. 59 at 28). Earnest Sr.'s grandson, Jessie, also was unaware of any such gambling problem. What Martin did with the money is unknown. He did not pay cash to Atkinson for his labor, and he used the car parts already in the Shop except for the top frame. According to Earnest Sr., however, the money was not spent on restoration work on any of Demory's vehicles since as far as he knew, Demory had stopped making payments.

In Martin's final attempt to deceive Demory as to the restoration work, Martin falsely represented that the vehicles were stolen when, in fact, the vehicles were still at the Shop. One of the vehicles, the Black 2-Door Impala, was hidden under a pile of tires. (Exs. 10-11). Martin speculated that employee cleaning up the yard had moved the tires on top of the Black 2-Door Impala without his permission or knowledge. (Adv. Dkt. 58 at 75-76). The photographs tell a different story. They show a disorganized mountain of tires in front of the car, uneven stacks of tires along both sides, and a layer of tires on top of the roof. (Exs. 10-11). The placement of the tires reflects a clear intention to hide the Black 2-Door Impala from view. Martin's attempt to deprive Demory permanently of his vehicles by telling him that the driver had stolen them may have succeeded if Demory had not investigated the alleged theft.

As to the issue of nondischargeability, Martin's main argument at Trial was that he did not ask for any more money after he lied to Demory about the theft of the vintage cars. A nondischargeability claim under § 523(a)(2)(A) does not require proof that the debtor obtained money or property for his benefit as a result of his fraud. *Morgan v. M.M. Winkler & Assocs. (In*

*re M.M. Winkler & Assocs.)*, 239 F.3d 746, 751 (5th Cir. 2001) ("The plain meaning of the statute . . . argues against a receipt of benefit requirement."). Moreover, by lying to Demory, Martin did receive a benefit although not in the form of money.

When considered collectively, Martin's actions created a contrived and misleading impression that the work for which Demory was paying Martin actually was being performed. Martin, on multiple occasions, lied to Demory about the progress of the restorations. This conduct ultimately induced Demory to continue sending checks to Martin whenever he requested more funds for labor and parts.

Martin's actions and statements resulted in Demory entering into the First Contract and later the Note, forbearing his collection efforts, including bringing civil suit. Demory did eventually bring suit against Martin—but not until after the execution and breach of two contractual agreements. The Court finds that Martin's conduct and misrepresentations created an overall false impression that induced Demory to continue making payments and to enter into two more contracts—ultimately causing him harm. *See In re Clem*, 583 B.R. at 384.

### 2.     Summary

The Note was an extension of credit given in exchange for Demory's forbearance of collection on his claims against Martin for his failure to perform under the First Contract. *See In re Allison*, 960 F.2d at 483. The Court finds that Martin's statements and conduct qualify as false representations, false pretenses, and actual fraud under § 523(a)(2)(A). Accordingly, the debt arising from the Default Judgment is nondischargeable. Because Demory has met his burden under § 523(a)(2)(A), the Court need not consider his other alleged grounds for denial of discharge under § 523(a)(6).

After the Trial ended, Demory filed a Motion for Award of Attorney's Fees and Expenses (the "Motion for Attorney's Fees") (Adv. Dkt. 56), and Martin filed the Earnest L. Martin Answer to Motion for Award of Attorney's Fees and Expenses. (Adv. Dkt. 57). The issue of attorneys' fees will be addressed in a separate order.

## Conclusion

Certain types of liabilities are excepted from the general rule of discharge in order to ensure that the Code's 'fresh start' policy is only available to the honest but unfortunate debtor. For the above and foregoing reasons, the Court finds that the debt arising out of the Default Judgment is nondischargeable pursuant to § 523(a)(2)(A). Accordingly, the Court finds that the Complaint is well-taken and should be granted. After the Motion for Attorney's Fees is resolved, a separate final judgment shall be entered in accordance with Rules 7054 and 9021 of the Federal Rules of Bankruptcy Procedure.

##END OF OPINION##